# United States Court of Appeals for the Federal Circuit

---

**EON-NET LP,**
*Plaintiff/Sanctioned Party-Appellant,*

**and**

**ZIMMERMAN & LEVI, L.L.P.**
**AND JEAN-MARC ZIMMERMAN,**
*Sanctioned Parties-Appellants,*

**v.**

**FLAGSTAR BANCORP,**
*Defendant-Appellee.*

---

2009-1308

---

Appeal from the United States District Court for the Western District of Washington in Case No. 05-CV-2129, Judge Ricardo S. Martinez.

---

Decided: July 29, 2011

---

JEAN-MARC ZIMMERMAN, Zimmerman, Levi & Korsinsky, LLP, of Westfield, New Jersey, argued for sanctioned party-appellant and sanctioned parties-appellants.

MELISSA J. BAILY, Quinn Emanuel Urquhart & Sullivan, LLP, of San Francisco, California, argued for defendant-appellee. Of counsel was KEVIN A. SMITH.

---

Before LOURIE, MAYER, and O'MALLEY, *Circuit Judges*.

LOURIE, *Circuit Judge*.

Eon-Net LP ("Eon-Net"), along with its counsel, Zimmerman & Levi, L.L.P. and Jean-Marc Zimmerman (collectively, "Zimmerman"), appeal from the final judgment of the United States District Court for the Western District of Washington in favor of Flagstar Bancorp ("Flagstar"). *See Eon-Net LP v. Flagstar Bancorp*, No. 2:05-CV-2129, Judgment (ECF No. 200) (W.D. Wash. Jun. 21, 2010) ("*Final Judgment*"). The judgment follows the district court's entry of the parties' stipulated order of noninfringement of Eon-Net's patents, specifically U.S. Patents 6,683,697 ("the '697 patent"), 7,075,673 ("the '673 patent"), and 7,184,162 ("the '162 patent"), *Eon-Net LP v. Flagstar Bancorp*, No. 2:05-CV-2129, Stipulation and Order (ECF No. 166) (W.D. Wash. Apr. 6, 2009) ("*Noninfringement Order*"), which the district court entered after it construed the claims of the asserted patents, *Eon-Net LP v. Flagstar Bancorp*, No. 2:05-CV-2129, Order on Claim Construction (ECF No. 162) (W.D. Wash. Mar. 4, 2009) ("*Claim Construction Opinion*"). After entering the stipulation, the district court also found the case to be exceptional under 35 U.S.C. § 285, *Eon-Net LP v. Flagstar Bancorp*, No. 2:05-CV-2129, Order (ECF No. 188) (W.D. Wash. Jan. 4, 2010) ("*Exceptional Case Order*"), and that Eon-Net and Zimmerman violated Federal Rule of Civil Procedure 11, *Eon-Net LP v. Flagstar Bancorp*, No. 2:05-CV-2129, Supplemental Order (ECF No. 195) (W.D. Wash. May 17, 2010) ("*Supplemental Order on Fees and Costs*"); *Eon-Net LP v. Flagstar Bancorp*, No. 2:05-CV-

2129, Order (ECF No. 79) (W.D. Wash. Oct. 4, 2006) ("*Rule 11 Sanctions Order*"). The district court awarded Flagstar $489,150.48 in attorney fees and costs pursuant to § 285 and $141,984.70 in sanctions for Eon-Net's and Zimmerman's violation of Rule 11. *Supplemental Order on Fees and Costs*, at 11.

Because the district court correctly construed the claims of the asserted patents, did not commit clear error in its exceptional case finding under 35 U.S.C. § 285, and did not abuse its discretion in invoking Rule 11 sanctions, we *affirm*.

## BACKGROUND

This patent case relates to document processing systems. Eon-Net owns the '697, '673, and '162 patents, which are part of a larger patent family that issued from continuation and divisional applications of a parent patent application filed in 1991 (the "Patent Portfolio"). The listed inventors include Mitchell Medina, Robert Leech, and Catherine Elias, and the inventors are principals of Eon-Net, which is one of a number of patent-holding companies formed to enforce various patents within the Patent Portfolio. *Exceptional Case Order*, at 1. The first five patents that issued were assigned to Eon-Net's companion corporation, Millennium L.P. ("Millennium"), the '697, '673, and '162 patents were assigned to Eon-Net, and subsequent patents were assigned to another related entity, Glory Licensing LLC ("Glory"). *Id.* at 1–2.

## A. The Asserted Patents

The asserted patents are entitled "Information Processing Methodology" and disclose a system and method for inputting information from a document, storing certain portions of the inputted document information in

memory according to content instructions, and formatting the stored document information for use by a computer program, effectuating a paperless office. Claim 1 of the '697 patent is representative of the claims on appeal, claiming a "multimode information processing system for inputting information from a document or file on a computer into at least one application program according to transmission format instructions." Specifically, claim 1 reads:

1. A multimode information processing system for inputting information from a *document* or *file* on a computer into at least one application program according to customizable transmission format instructions, and to operate in at least one of:

  a. a definition mode wherein content instructions are used to define input information from within said *document* or *file* required by said at least one application program; and

  b. an extraction mode to parse at least a portion of said *document* or *file* to automatically extract at least one field of information required by said at least one application program and to transfer said at least one field of information to said at least one application program according to said customizable transmission format instructions.

'697 patent, col.15, ll.46–61 (emphases added). The claimed invention is directed to a "system for efficiently processing information originating from hard copy docu-

ments," *id.* col.1 ll.15–17,[1] and Figure 1 of the written description shows a preferred embodiment where the document (100) is scanned into memory for processing by a computer that contains a number of application units that utilize the information obtained from the scanned document:



FIG. 1

In Figure 1, the scanner extracts information from a hard copy document and stores that information in either its memory (220) or the computer's main memory (250). *Id.* col.4 ll.55–67. The computer then reads the document information from either memory and selects portions of

---

[1] Because the '697, '673, and '162 patents share a common written description, we cite only the '697 patent and refer to the three written descriptions in the singular.

the document information according to content instructions, which define the portions of the document information that a particular application unit requires. *Id.* col.5 ll.8–15. After the computer has obtained the selected portions of the document, it formats the selected portions into the format required by a particular application unit according to transmission format instructions and creates an input file for use by the application unit. *Id.* col.5 ll.16–51.

The written description provides an example that more concretely describes the patented system. In the example, a small business can create electronic copies of its business records and use computer applications such as Quicken® to manipulate information contained in those hard copy documents. *Id.* col.14 l.53–col.15 l.5. In this example, the system first obtains information from hard copy business records using content instructions that indicate the portions of the documents that contain information that can be used by Quicken®, such as the portions of an invoice that contain the payee address or invoice amount. *Id.* col.5 ll.8–15, col.14 ll.53–63. The computer then formats the selected information into a format recognized by Quicken® and creates an input file that a user can open in the Quicken® application. *Id.* col.5 ll.16–51, col.14 ll.53–63. After launching Quicken® and opening the input file, the user can manipulate the information obtained from the hard copy documents to manage accounts, write checks, and prepare business records. *Id.* col.14 l.53–col.15 l.5.

## B. The Litigation

The Patent Portfolio has a long litigation history, beginning in 1996. *Exceptional Case Order*, at 2. Between 1996 and 2001, Millennium filed four lawsuits asserting various claims of the Patent Portfolio. *Id.* at 2 n.3. After

2001, Zimmerman began to represent Millennium as its litigation counsel, and, in the course of his representation, Zimmerman filed a large number of lawsuits alleging infringement of the Patent Portfolio. *Id.* at 3–4. By the time the district court found that Eon-Net's conduct presented an exceptional case under 35 U.S.C. § 285, Zimmerman had filed over 100 lawsuits on behalf of Eon-Net or its related entities asserting infringement of the Patent Portfolio. *Id.* at 2–4. Almost all of these cases resulted in early settlements or dismissals. *Id.* at 4.

Eon-Net sued Flagstar in 2005, alleging that the processing of information entered by customers on Flagstar's website infringed various claims of the '697 patent. Early in the case, Flagstar moved for summary judgment of noninfringement because it utilized document processing technology provided by Kofax Image Products, Inc., who held a license to the '697 patent. *Id.* At the same time, Flagstar filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 11 on the basis that Eon-Net failed to investigate or identify allegedly infringing products and that Eon-Net asserted baseless infringement claims. *Id.* at 5. The district court granted both motions, concluding that the written description limited the asserted claims to processing information originating from a hard copy document, that Eon-Net's position that the claims covered the processing of information entered on a website was baseless, and that Eon-Net failed to investigate or identify allegedly infringing products prior to filing suit. *Id.* at 4–7. The district court accordingly assessed attorney fees and costs against Eon-Net and Zimmerman for their violation of Rule 11. *Id.* at 5; *see also Eon-Net LP v. Flagstar Bancorp*, No. 2:05-CV-2129, Judgment by Court (ECF No. 89) (W.D. Wash. Dec. 19, 2006).

Eon-Net and Zimmerman appealed. On appeal, we vacated and remanded both the summary judgment ruling and the imposition of sanctions because the district court failed to afford Eon-Net notice and the opportunity to present its infringement and claim construction arguments during the briefing on the motions. *Eon-Net LP v. Flagstar Bancorp*, 249 F. App'x 189, 198 (Fed. Cir. 2007) ("*Eon-Net I*"). Without a full claim construction analysis, including a consideration of Eon-Net's claim construction arguments, we held that it was impossible to determine if Eon-Net's claim construction and infringement positions were without merit. *Id.* at 193, 196. We expressly declined, however, to "pass[] judgment on what the appropriate construction of the '697 patent should be." *Id.* at 196.

On remand, the district judge who initially handled the case recused herself. *Exceptional Case Order*, at 7–8. Upon reassignment to a second district judge, Eon-Net amended its complaint to add infringement allegations for the '673 and '162 patents, and the parties engaged in the claim construction process. *Id.* at 8. After reviewing the parties' briefs and holding a hearing, the district court construed the disputed claim terms. *Claim Construction Opinion*, at 1. Central to this appeal, the district court concluded that the terms "document," "file," "extract," and "template" were limited to information originating from a hard copy document. *Id.* at 17–19. Based on these constructions, Eon-Net stipulated to noninfringement of the asserted claims. *Noninfringement Order*, at 1.

Flagstar subsequently moved for attorney fees pursuant to 35 U.S.C. § 285, and the district court granted Flagstar's motion. *Exceptional Case Order*, at 22. The district court based its exceptional case finding on what it found were Eon-Net's pursuit of baseless infringement claims, Eon-Net's improper purpose of bringing the law-

suit against Flagstar to obtain a nuisance value settlement, Eon-Net's destruction of evidence, and Eon-Net's offensive litigation tactics. *Id.* at 13–21. The district court invited Flagstar to renew its motion to impose Rule 11 sanctions. *Id.* at 22.

Flagstar thereafter renewed its motion for sanctions pursuant to Rule 11 and submitted a statement of attorney fees and costs expended on the litigation. The district court granted Flagstar's motion for sanctions, concluding that Eon-Net and its counsel failed to perform a reasonable pre-filing investigation and that their claim construction positions were unsupportable. *Supplemental Order on Fees and Costs*, at 6–8. Thus, the district court reinstated in full the $141,984.70 in attorney fees and costs against Eon-Net and Zimmerman for their violation of Rule 11. *Id.* at 8. Regarding § 285, the court awarded Flagstar $489,150.48 in attorney fees and costs for litigating the case following remand. *Id.* at 11.

Eon-Net and Zimmerman timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

### DISCUSSION

Eon-Net appeals the district court's construction of the terms "document," "file," "extract," and "template." Eon-Net also appeals the district court's imposition of Rule 11 sanctions and the district court's exceptional case finding.[2] We address each issue below.

---

[2]    Eon-Net also requests that, on remand, we order the reassignment of this case to another district judge in another judicial district. Because we affirm the district court's final judgment, we deny Eon-Net's request.

A.  Claim Construction

We review a district court's claim construction *de novo*.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454–55 (Fed. Cir. 1998) (en banc).  To ascertain the scope and meaning of the asserted claims, we look to the words of the claims themselves, the written description, the prosecution history, and, lastly, any relevant extrinsic evidence.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–19 (Fed. Cir. 2005) (en banc).

As a general rule, claim terms should be given their ordinary and customary meaning to persons of skill in the art as of the effective date of the patent application.  *Id.* at 1312–13.  Although the claims of a patent define the invention for which the patentee is entitled to an exclusionary right, we must read the claims "in view of the specification, of which they are a part."  *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).  The specification is "the single best guide to the meaning of a disputed claim term," and, usually, the specification's use of a claim term is dispositive.  *Phillip*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374–75 (Fed. Cir. 2009).  Thus, the specification is "always highly relevant to the claim construction analysis."  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582).

Eon-Net appeals the district court's construction of the terms "document," "file," "extract," and "template."  Eon-Net argues that the ordinary meanings of "file" and "document" are not limited to information derived from a

hard copy document.* Eon-Net asserts that the written description discloses a "computer file embodiment," and that the asserted claims are directed to this embodiment. Finally, Eon-Net argues that the United States Patent & Trademark Office has allowed claims in related patent applications that expressly recite that the claimed "document" or "file" is "not derived from scanning a hard copy document," which, according to Eon-Net, shows that the "document" and "file" terms are not limited to information originating from a hard copy document.

Flagstar responds that the written description defines the claimed invention as a system for processing information that originates from hard copy documents. Flagstar also argues that Eon-Net's claim differentiation argument fails because the clear import of the written description is that the patents are limited to processing information that originates from hard copy documents.

We agree with Flagstar that the disputed claim terms are limited to information that originates from a hard copy document. The written description repeatedly and consistently defines the invention as a system that processes information derived from hard copy documents. The Background of the Invention section explains that "conventional systems have limitations which decrease the efficiency of processing information from a hard copy document." '697 patent, col.1 ll.34–36. Thus, "[t]he invention is directed to a system for efficiently processing information originating from hard copy documents," more specifically to "a hard copy document application program interface which minimizes the need to manually process hard copy documents." *Id.* col.1 ll.15–20.

---

\* Our disposition of Eon-Net's arguments regarding "extract" and "template" is the same as that for "document" and "file" for the same reasons.

Consistent with that defined field, the Summary of Invention section defines the "invention" as providing "an application program interface which inputs a diversity of hard copy documents using an automated digitizing unit and which stores information from the hard copy documents in a memory as stored document information." *Id.* col.2 ll.48–52. This definition furthers the objects of the invention, which include to "provide an application program interface which allows a user to select specific portions of information extracted from a diversity of hard copy documents"; "provide an application program interface which will allow the extraction, selection, formatting, routing, and storage of information from a hard copy document"; and "provide a cost effective system for inputting hard copy documents which can accommodate hard copy documents in a diversity of formats." *Id.* col.2 ll.19–47.

Similarly, in describing the invention in detail, the written description explains that "the invention provides an interface between information originating from a hard copy document and a computer application unit which uses the information." *Id.* col.4 ll.13–15. As part of this disclosure, the written description teaches that the claimed "file" contains information that originated from a hard copy document, explaining that the "instant invention" provides for parsing information extracted from a hard copy document and transmitting that information as an "input file" to a user or application. *Id.* col.4 ll.46–52. The written description concludes that "the instant invention provides an integrated and comprehensive system for handling information from a hard copy document, thus permitting a paperless office." *Id.* col.14 ll.64–66. In total, the term "hard copy document" appears over 100 times in the common disclosure of the '697, '673, and '162 patents.

These statements about the invention are not limited to specific embodiments or examples but describe and define the invention overall. Thus, Eon-Net's argument that the written description provides support for a "computer file embodiment" is without merit.

Eon-Net primarily points to Figure 5 of the written description and the accompanying text to argue that they disclose an embodiment wherein the processed "document" or "file" is not limited to information originating from a hard copy document. Figure 5, however, details the input process for the preferred embodiment of the invention described in Figure 1, *id.* col.7 ll.23–57, which, as described above, illustrates the system for processing information from a hard copy document "according to the instant invention," *id.* col.4 ll.53–55. The input data flow process performed by this system, as depicted in Figure 5 below, shows that the "input document" can include text information from a character input (1.1) or character recognition hardware (1.3), image information provided by a scanner (1.2), and information from a communication interface connected to an external device (4.0):



## FIG. 5

The written description explains that the character input module (1.1) "inputs textual information, such as alphanumeric characters, from an input device such as [a] keyboard." *Id.* col.7 ll.45–47 (internal reference numbers omitted). Eon-Net argues that because the character input module allows a user to enter textual information for processing as an "input document," this disclosure shows that the invention is not limited to information originating from a hard copy document.

The written description, however, states that Figure 5 describes the data flow process for a system that processes information originating from a hard copy document. *Id.* col.4 ll.53–55, col.7 ll.23–57. Indeed, the written description explains that "[t]he hard copy document may contain textual information or image information or both." *Id.* col.2 ll.60–62. Absent from the specification is any teaching that the textual information is information

other than information originating from a hard copy document. Thus, Figure 5 and the related disclosure are consistent with the remainder of the written description, which repeatedly defines the invention as a system for processing information originating from hard copy documents.

Eon-Net's claim differentiation argument is also unavailing. First, "claim differentiation is a rule of thumb that does not trump the clear import of the specification," *Edwards Lifesciences, LLC v. Cook Inc.*, 582 F.3d 1322, 1331 (Fed. Cir. 2009), and, in this case, the written description defines the invention as a system for processing information that originates from a hard copy document. Second, the claims in the Patent Portfolio that Eon-Net points to recite that the claimed "file" or "document file" is not derived from "scanning a hard copy document." *E.g.*, U.S. Patent 7,570,383, claim 3; U.S. Patent 7,672,007, claim 6. The specification discloses that "scanning" is only one of many methods to obtain information from a hard copy document, such as using an electrical or optical device to extract information from a hard copy document. '697 patent, col.15 ll.17–24. Thus, while these claims may show that the claimed invention encompasses the processing of information originating from a hard copy document that was obtained by a method other than scanning, the claim language does not address whether the construction of "document" or "file" may expand beyond encompassing information originating from a hard copy document.

In sum, we agree with the district court's construction of the "document," "file," "extract," and "template" terms. This is not a case where a district court improperly imported a limitation from the specification or where the question of what the specification teaches about the claims presents a close call; here, the specification unequivocally compels the constructions adopted by the

district court. Accordingly, because Eon-Net stipulated to noninfringement of the asserted claims of the '697, '673, and '162 patents under the district court's claim construction, we affirm the court's judgment of noninfringement.

## B. Exceptional Case Finding

A district court is vested with the authority to award attorney fees to a prevailing party in patent litigation if it determines that the case is "exceptional." 35 U.S.C. § 285. A determination whether to award attorney fees under § 285 involves a two-step process. First, a district court must determine whether the prevailing party has proved by clear and convincing evidence that the case is exceptional. *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1327 (Fed. Cir. 2003). We review *de novo* whether the district court applied the proper legal standard, and we review the court's exceptional case finding for clear error. *Id.* at 1328. Second, if the district court finds the case to be exceptional, the court must then determine whether an award of attorney fees is appropriate and, if fees are appropriate, the amount of the award. *Cybor*, 138 F.3d at 1460. We review that determination for an abuse of discretion. *Id.*

When reviewing an exceptional case finding for clear error, we are mindful that the district court has lived with the case and the lawyers for an extended period. Having only the briefs and the cold record, and with counsel appearing before us for only a short period of time, we are not in the position to second-guess the trial court's judgment. However, because of the substantial economic and reputational impact of an award of attorney fees, we examine the record with care to determine whether the trial court clearly erred in its exceptional case finding. *Medtronic Navigation, Inc. v. BrainLAB Medizinische*

*Computersysteme GmbH*, 603 F.3d 943, 953 (Fed. Cir. 2010).

Here, Eon-Net only appeals the district court's exceptional case finding and has not appealed the district court's determination of the amount of attorney fees and costs. Eon-Net argues that the district court clearly erred in its exceptional case finding, asserting that Eon-Net proffered reasonable claim construction positions, that the purpose of its lawsuit—to obtain licensing revenue—was proper, that Eon-Net did not destroy any relevant documents, and that Eon-Net's litigation tactics were not offensive or vexatious. Thus, argues Eon-Net, the district court committed clear error and its exceptional case finding should be reversed.

We disagree. It is undisputed that the district court applied the correct legal standard under 35 U.S.C. § 285. Regarding the court's factual finding, as a general matter, we have observed that many varieties of misconduct can support a district court's exceptional case finding, including lodging frivolous filings and engaging in vexatious or unjustified litigation. *See Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1387–88 (Fed. Cir. 2008). Indeed, "[l]itigation misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285." *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1106 (Fed. Cir. 2003). Absent litigation misconduct or misconduct in securing the patent, sanctions under § 285 may be imposed against the patentee only if both (1) the patentee brought the litigation in bad faith; and (2) the litigation is objectively baseless. *Brooks Furniture Mfg., Inc. v. Dutailer Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005).

Here, the district court found that Eon-Net's litigation misconduct and its filing of a baseless infringement action

in bad faith for an improper purpose warranted an exceptional case finding. We conclude that the district court did not clearly err in so finding and address each category of conduct below.

### 1. Litigation Misconduct

The district court's opinion recounted numerous instances of litigation misconduct. First, the district court found that Eon-Net and its counsel destroyed relevant documents prior to the initiation of its lawsuit against Flagstar and that Eon-Net intentionally did not implement a document retention plan. *Exceptional Case Order*, at 17–18. As recounted by the district court, Eon-Net's principal, Mitchell Medina, testified with regard to document retention, collection, and production that "I don't save anything so I don't have to look" and further testified that Eon-Net and Millennium "have adopted a document retention policy which is that we don't retain any documents" because those companies have "evolved into patent enforcement companies which are involved in the business of litigation." *Id.* at 8–9. Pursuant to this policy, in 2003, Medina and Zimmerman discarded all documents from Millennium's infringement action against Readsoft involving the Patent Portfolio, even though Millennium had other pending cases. *Id.* at 9–10. While Zimmerman asserts on appeal that, after the *Readsoft* case settled, he only "discarded publicly available documents and non-essential documents such as travel-related receipts" and retained "all material non-public documents," Appellant Br. 52, it is impossible to determine the veracity of that statement. And, even if Zimmerman's assertions are true, it is undisputed that Medina and ultimately Eon-Net had an independent duty to preserve evidence during the ongoing lawsuits, *see Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1575 (Fed. Cir. 1996), and, in light of Medina's

testimony, it was not clear error for the district court to conclude that Eon-Net did not observe that duty.

The district court also detailed Eon-Net's litigation tactics. In particular, the district court found that Eon-Net failed to engage the claim construction process in good faith because Eon-Net failed to offer a construction for any disputed claim terms, lodged incomplete and misleading extrinsic evidence with the court, and submitted declarations that contradicted earlier deposition testimony by the declarants. *Exceptional Case Order*, at 15–16. The district court concluded that Eon-Net "attempted to evade a careful analysis of the claim terms through the *Markman* process" after it prevailed in the *Eon-Net I* appeal on the basis that the district court "improperly granted summary judgment without affording Eon-Net notice and an opportunity to argue its position on the scope of the patent claims." *Id.* at 14.

Eon-Net argues that it was not improper to argue that no claim terms of the asserted patents required construction because the district court was not obligated to construe every recited claim term. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). While it is certainly true that a district court is not obligated to construe every claim term, Eon-Net ignores the district court's analysis, which is grounded on Eon-Net's failure to engage the claim construction process in good faith, including Eon-Net's submission of incomplete and misleading extrinsic evidence.

Moreover, Eon-Net's failure to engage the claim construction process in good faith was only one of many instances of misconduct detailed by the district court. The district court also found that Medina displayed a "lack of regard for the judicial system" and that Eon-Net and Medina had a "cavalier attitude" towards the "patent

litigation process as a whole." *Exceptional Case Order*, at 18–19. As evidence, the district court cited Eon-Net's interrogatory response produced in another case involving the Patent Portfolio which snidely stated that "the skill in the art required is that sufficient to converse meaningfully with Mitchell Medina." *Id.* at 19. In addition, the district court detailed the deposition testimony of Medina, where he complained that his deposition was "an inconvenience and a bother" and fumed that he was "so sick of this stuff by now. I am so sick of this stuff, especially this haggling over stupidities and trivialities which is the name of the game in litigation." *Id.* at 18–19.

Eon-Net argues that the district court should not have considered the interrogatory response as part of its § 285 analysis because the interrogatory response was a "draft" response and was inadvertently served in a different case. The response, however, contains Zimmerman's signature, and there is no indication that Eon-Net amended or withdrew the interrogatory response or, prior to the threat of sanctions in this case, communicated that the response was mistakenly served. Eon-Net also fails to address the district court's findings based on Medina's deposition testimony, and while it might be said that Medina's remarks were only flippant, facetious remarks not intended to offend, the trial court heard all the evidence and made its judgment, which we are not inclined to override. In toto, Eon-Net has failed to show that the district court's findings regarding Eon-Net's litigation misconduct were clearly erroneous.

### 2. Filing Objectively Baseless Litigation in Bad Faith

Eon-Net also challenges the district court's finding that Eon-Net pursued baseless infringement allegations in bad faith and for an improper purpose. In support,

Eon-Net points to dictum in our opinion in its prior appeal, where we stated that the written description supports Eon-Net's infringement allegations in this case because it provides "that the hardware for inputting data can include 'a keyboard, a light pen, a mouse, a touch screen, a laser scanner, a microphone, a tablet, a disk drive, a magnetic tape drive, and a modem.'" *Eon-Net I*, 249 F. App'x at 196.

We disagree. As explained above, the written description repeatedly defines the invention as a system for processing information that originates from hard copy documents, and, under this construction, it is undisputed that Flagstar does not infringe any asserted claim of the '697, '673, and '162 patents. Thus, because the written description clearly refutes Eon-Net's claim construction, the district court did not clearly err in finding that Eon-Net pursued objectively baseless infringement claims. *Cf. iLOR v. Google, Inc.*, 631 F.3d 1372, 1378–79 (Fed. Cir. 2011) (reversing finding that the patentee's claim construction position was objectively baseless where "[o]n its face, the claim language does not preclude the patentee's construction," the written description failed to "clearly refute the patentee's construction," and the patentee could reasonably argue that the prosecution history did not preclude its construction).

The dictum from *Eon-Net I* upon which Eon-Net relies does not alter this result. In *Eon-Net I*, we noted that one portion of the written description supported Eon-Net's construction because it discloses that the hardware for inputting document information can include devices other than a scanner, such as a light pen or other device. 249 F. App'x at 196. However, as explained above, the cited passage does not speak to the character of the information processed, which the written description as a whole repeatedly and expressly defines as information originat-

ing from a hard copy document. *See Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1398 (Fed. Cir. 2009) (explaining that disputed claim language "must be read in the context of the entire specification and prosecution history"). Indeed, the *Eon-Net I* opinion expressly leaves open the possibility that, after a full claim construction analysis, the district court could conclude that Eon-Net's claim construction position was baseless, 249 F. App'x at 196, which is what happened in this case on remand.

In addition to finding that Eon-Net filed an objectively baseless infringement action, the district court also determined that Eon-Net filed the lawsuit in bad faith and for an improper purpose. *Exceptional Case Order*, at 16–17. In particular, the district court found that Eon-Net's case against Flagstar had "indicia of extortion" because it was part of Eon-Net's history of filing nearly identical patent infringement complaints against a plethora of diverse defendants, where Eon-Net followed each filing with a demand for a quick settlement at a price far lower than the cost to defend the litigation. *Id.*

The record supports the district court's finding that Eon-Net acted in bad faith by exploiting the high cost to defend complex litigation to extract a nuisance value settlement from Flagstar. At the time that the district court made its exceptional case finding, Eon-Net and its related entities, Millennium and Glory, had filed over 100 lawsuits against a number of diverse defendants alleging infringement of one or more patents from the Patent Portfolio. *Id.* at 2–4, 16. Each complaint was followed by a "demand for a quick settlement at a price far lower than the cost of litigation, a demand to which most defendants apparently have agreed." *Id.* at 16. In this case, as with the other cases, Eon-Net offered to settle using a license fee schedule based on the defendant's annual sales: $25,000 for sales less than $3,000,000; $50,000 for sales

between $3,000,000 and $20,000,000; and $75,000 for sales between $20,000,000 and $100,000,000. *Rule 11 Sanctions Order*, at 3–4.

Meritless cases like this one unnecessarily require the district court to engage in excessive claim construction analysis before it is able to see the lack of merit of the patentee's infringement allegations. *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). In this case, Flagstar expended over $600,000 in attorney fees and costs to litigate this case through claim construction. *Supplemental Order on Fees and Costs*, at 8–11. Viewed against Eon-Net's $25,000 to $75,000 settlement offer range, it becomes apparent why the vast majority of those that Eon-Net accused of infringement chose to settle early in the litigation rather than expend the resources required to demonstrate to a court that the asserted patents are limited to processing information that originates from a hard copy document. Thus, those low settlement offers—less than ten percent of the cost that Flagstar expended to defend suit—effectively ensured that Eon-Net's baseless infringement allegations remained unexposed, allowing Eon-Net to continue to collect additional nuisance value settlements.

In addition, Eon-Net had the ability to impose disproportionate discovery costs on Flagstar. This is, at least in part, because accused infringers often possess enormous amounts of potentially relevant documents that are ultimately collected and produced. *See In re Nintendo Co.*, 589 F.3d 1194, 1199 (Fed. Cir. 2009). The Federal Rules of Civil Procedure, as well as the local discovery rules and policies of a number of district courts, allow for liberal discovery, and it is not uncommon for an accused infringer to produce millions of pages of documents, collected from central repositories and numerous document custodians. Those discovery costs are generally paid

by the producing party, *see Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978), increasing the nuisance value that an accused infringer would be willing to settle for in a patent infringement case. In this case, it is notable that the district court stayed all discovery that did not relate to claim construction issues, and, while Flagstar expended over $600,000 to litigate this case, that amount would have substantially increased if the district court had allowed full discovery.

In addition to its ability to impose high costs to defend against its meritless claims, Eon-Net placed little at risk when filing suit. As a non-practicing entity, Eon-Net was generally immune to counterclaims for patent infringement, antitrust, or unfair competition because it did not engage in business activities that would potentially give rise to those claims. And while Eon-Net risked licensing revenue should its patents be found invalid or if a court narrowly construed the patents' claims to exclude valuable targets, Eon-Net did not face any business risk resulting from the loss of patent protection over a product or process. Its patents protected only settlement receipts, not its own products.

Eon-Net argues that it is not improper for a patentee to vigorously enforce its patent rights or offer standard licensing terms, and Eon-Net is correct. But the appetite for licensing revenue cannot overpower a litigant's and its counsel's obligation to file cases reasonably based in law and fact and to litigate those cases in good faith. Here, the district court did not clearly err when it found that Eon-Net filed an objectively baseless infringement action against Flagstar and brought that action in bad faith, specifically to extract a nuisance value settlement by exploiting the high cost imposed on Flagstar to defend against Eon-Net's baseless claims. It also appears that in filing this case, Zimmerman merely followed the direction

of his client, Medina, who Zimmerman characterized at oral argument as "difficult to control." Oral Arg. at 28:05-28:20, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2009-1308.mp3. But an attorney, in addition to his obligation to his client, also has an obligation to the court and should not blindly follow the client's interests if not supported by law and facts. In these circumstances, coupled with the district court's supported findings regarding Eon-Net's litigation misconduct, we conclude that the district court did not clearly err in its exceptional case finding.

## C. Rule 11 Sanctions

Eon-Net also appeals the district court's imposition of Rule 11 sanctions. We apply the law of the regional circuit, here the Ninth Circuit, to review an award of Rule 11 sanctions. *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1406–07 (Fed. Cir. 2004). Before a district court awards Rule 11 sanctions under Ninth Circuit law, the district court must determine that the complaint is "legally or factually 'baseless' from an objective perspective" and that the attorney failed to conduct a "reasonable and competent inquiry" before filing the complaint. *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) (quoting *Buster v. Greisen*, 104 F.3d 1186, 1190 (9th Cir. 1997)). We review all aspects of a district court's imposition of Rule 11 sanctions under an abuse of discretion standard. *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990).

The district court imposed Rule 11 sanctions against Zimmerman and Eon-Net because it found that Eon-Net's infringement allegations were legally baseless and that Eon-Net and Zimmerman failed to perform a reasonable pre-suit investigation. Eon-Net argues that its claim

construction was not objectively baseless. As explained above, however, the district court did not clearly err in concluding that Eon-Net's infringement allegations were objectively baseless, and, for the same reasons, the district court did not abuse its discretion in finding that Eon-Net's infringement allegations were legally baseless.

Regarding Eon-Net's pre-suit investigation, Zimmerman claims that he compared Flagstar's website and the website's publicly-available source code to each limitation of the asserted claims and generated a claim chart. Thus, Eon-Net and Zimmerman argue that the district court abused its discretion in finding that Zimmerman failed to conduct a reasonable pre-suit investigation.

We disagree. We noted in *Eon-Net I* that "[t]here is really no dispute that Eon-Net's counsel did examine portions of Flagstar's website and, based on his experience, concluded that it worked in a manner that infringed the '697 patent." 249 F. App'x at 196. A reasonable pre-suit investigation, however, also requires counsel to perform an objective evaluation of the claim terms when reading those terms on the accused device. *See Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300–01 (Fed. Cir. 2004); *S. Bravo Sys., Inc. v. Containment Techs. Corp.*, 96 F.3d 1372, 1375 (Fed. Cir. 1996). The district court concluded that the written description expressly defines the invention as a system for processing information originating from hard copy documents, *Claim Construction Opinion*, at 17–19, finding that Eon-Net's contrary claim construction position "borders on the illogical" and that "[t]he specification exposes the frivolity of Eon-Net's claim construction position." *Rule 11 Sanctions Order*, at 12–13. For the reasons stated above, those findings were not clearly erroneous. Accordingly, Eon-Net has failed to meet its high burden to show that the dis-

trict court abused its discretion in imposing Rule 11 sanctions.

## CONCLUSION

We have considered Eon-Net's remaining arguments and conclude that they are without merit. For the foregoing reasons, the judgment of the district court is affirmed.

**AFFIRMED**